Bennie JACKSON, Plaintiff–Appellant,

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, LOCAL UNION 705 and Gerald Zero, individually and in his official capacity with Local # 705, Defendants–Appellees.

No. 04–3300.

United States Court of Appeals, Seventh Circuit.

Submitted March 8, 2005.*

Decided March 9, 2005.

---

* After an examination of the briefs and the record, we have concluded that oral argument is unnecessary. Thus, the appeal is submitted on the briefs and the record. *See* Fed. R.App. P. 34(a)(2).

Bennie Jackson, Chicago, IL, pro se.

Michael H. Slutsky, Allison, Slutsky & Kennedy, Chicago, IL, for Defendant–Appellee.

Before MANION, KANNE, and EVANS, Circuit Judges.

## ORDER

In this employment discrimination case, Bennie Jackson, an African American, sued his former employer, International Brotherhood of Teamsters, Local 705 (the "union"), under Title VII, 42 U.S.C. §§ 2000e *et seq.*, alleging among other things race discrimination and retaliatory discharge. The district court granted summary judgment for the union because Jackson did not establish that he suffered an adverse employment action or that similarly situated white employees were treated more favorably, as required for a prima facie of discrimination or retaliation. We affirm.

For over twenty years, Jackson worked at United Parcel Service, whose employees comprised the majority of the union's membership. In 1994, the union hired Jackson as a business agent/union representative. In elections for the union's executive board in 1995, Jackson ran on a slate with four white candidates headed by Gerald Zero. Zero's slate prevailed and Zero was elected secretary-treasurer—the board's chief executive—while Jackson was elected recording secretary. In 1997, the five board members again ran together, winning the next election, and Zero and Jackson retained the same posts. In 2000, however, the slate of candidates who had formerly run with Zero, including Jackson, ran together on a slate opposing Zero's reelection, and Zero defeated them. Jackson's elected term expired at the end of 2000, whereupon he retired as a business agent.

Jackson alleges four incidents to support his claim that Zero racially discriminated against him in the months leading up to the 2000 election. First, in February 2000, Zero circulated a memorandum spotlighting one of Jackson's weekly written reports as an example of a report lacking sufficient detail.

Second, in March, Zero racially discriminated against him by reassigning him from an office to a cubicle and having his belongings removed to the hallway. Jackson said that several of his personal items—including $180 from his desk—went missing while his belongings sat unattended.

Third, Jackson alleged that when he accused Zero of stealing his belongings, Zero racially discriminated against him by responding "to leave your money in your office drawer, you're a stupid goofball for doing something like that," delivering this remark in a way that "mimicked Jackson's ethnic speech patterns."

Finally, Jackson alleged that Zero terminated him from his position as a business agent based on his race and in retaliation for filing a race discrimination charge with the Illinois Department of Human rights. Jackson had filed a charge of race discrimination with IDHR against Zero and the union based on Zero: (1) circulating the memorandum disparaging his activity report; (2) reassigning him from an office to a cubicle; (3) stealing his personal items; and (4) insulting him. Then in April 2000, Zero terminated each of the four board members opposing him in the upcoming election—including Jackson—from their appointed positions as business agents, though not from their elected positions as board members. They were unable to perform their duties as board members, however, because Zero denied them access to their offices and work materials. The four board members—including Jackson—sued Zero and the Union in the

Northern District of Illinois, alleging that their terminations constituted retaliation for their union political activities in violation of the Labor Management Reporting and Disclosure Act, 29 U.S.C. § 412. *McCormick v. Zero,* 110 F.Supp.2d 716, 719 (N.D.Ill.2000) (unpublished order). Meanwhile Jackson amended his IDHR charge to allege retaliatory discharge. The district court issued a temporary restraining order and later a preliminary injunction restoring the plaintiffs to their positions. While Zero's appeal was pending, he defeated the plaintiffs in the fall 2000 election, thereby mooting their claims, and so we dismissed the case. *See McCormick v. Zero,* 2 Fed.Appx. 559, 561 (7th Cir.2001) (unpublished order).

In April 2002, after the EEOC issued Jackson a right-to-sue letter, he filed this second suit in federal court claiming discrimination and harassment based on race and retaliatory discharge. Specifically, he alleged: (1) that because of his race, Zero circulated a disparaging remark about the quality of his activity report, reassigned him from an office to a cubicle, stole his personal items and insulted him; (2) that Zero terminated him as a business agent because of his race and in retaliation for filing a charge with IDHR; and (3) that the union tolerated a hostile work environment.

The court granted summary judgment for the union. The court first addressed Jackson's claims of race discrimination and retaliatory discharge. Given the absence of direct or circumstantial evidence, the district court analyzed these claims under the indirect method, *see McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and held that he could not make out a prima facie case. Aside from his termination, the court determined, Jackson lacked evidence of an adverse employment action. With respect to his termination, the judge found that Jackson produced no evidence that similarly situated employees who were not African–American, or employees who did not file charges with IDHR, were treated more favorably. Finally, the court found, the use of his activity report, loss of his office and theft of his belongings were not severe enough to amount to a hostile work environment.

Proceeding pro se on appeal, Jackson asserts that the court erred in granting summary judgment because he did establish a prima facie case of race discrimination and retaliatory discharge. But his brief introduces new statements of fact not included in his summary judgment response and he cites neither the record nor relevant authority. Construing his brief liberally, *see Anderson v. Hardman,* 241 F.3d 544, 545 (7th Cir.2001), we can discern two issues to review.

First, Jackson argues that the district court erred in stating that he could not meet the similarly-situated prong of his prima facie case. Under the *McDonnell Douglas* indirect method, Jackson has the burden of establishing a prima facie case of discrimination or retaliation by showing: (1) that he is in a protected group or engaged in a protected activity; (2) that his job performance was adequate; (3) that he was subjected to an adverse employment action (or some adverse action for retaliation); and (4) that similarly situated employees outside his group were not. *See McDonnell Douglas,* 411 U.S. at 802; *Volovsek v. Wis. Dep't of Agric. Trade & Consumer Protection,* 344 F.3d 680, 689 n. 7 (7th Cir.2003). As relevant here, that burden obligates him to produce evidence that white or non-complaining similarly situated employees were treated more favorably than he was. *See Lucas v. Chicago Transit Auth.,* 367 F.3d 714, 730 n. 16 (7th Cir.2004). To show that an employee is similarly situated, Jackson must demonstrate that "there is someone who is di-

rectly comparable in all material respects." *Grayson v. O'Neill,* 308 F.3d 808, 819 (7th Cir.2002). Jackson has failed to point to any such individual, and this failure is fatal to his prima facie case.

■ Jackson has one additional argument. At summary judgment, the court deemed admitted several of the union's fact statements because Jackson's former counsel failed to conform his response to Local Rule 56.1(b)(3)(A) by providing record citations to support his challenges. Acknowledging that his response to summary judgment did not comply with Local Rule 56.1, Jackson now argues that the district court erred in not allowing him the opportunity to revise his response before granting summary judgment against him. But he never asked the district judge for leave to supplement or modify his response and it is too late do so now. *See DFS Secured Healthcare Receivables Trust v. Caregivers Great Lakes, Inc.,* 384 F.3d 338, 349 (7th Cir.2004).

AFFIRMED.